State, Pancoast, pros., v. Troth et al.

---

## THE STATE, EMILY PANCOAST, PROSECUTRIX, v. JOSEPH E. TROTH ET AL.

1. The Court of Common Pleas has jurisdiction to appoint surveyors of the highways to lay out a road within the limits of an incorporated city, in the absence of special provisions in its charter superseding or excluding the means of procuring new highways, within the boundaries of the city, which exists in the general provisions of the road act. Its jurisdiction can only be excluded by an implication arising from the fact that the town authorities are clothed with full and complete jurisdiction over the same subject matter.

2. The thirty-fourth section of the act concerning roads, (*Nix. Dig.* 829,*) which forbids the pulling down or removal of "any dwelling-house, market-house, or other public building heretofore erected, and which may encroach upon any highway," is restrictive of the powers of surveyors of the highways in laying out roads, as well as of the powers of overseers of the roads in removing encroachments.

3. An engine-house owned and occupied by a fire company, which is situate upon the lands of a private individual, is not a public building within the meaning of this section. Nor is a billiard saloon attached to a hotel, and used by the tenant of the hotel as a billiard saloon, and not otherwise, a dwelling-house within the protection of the section.

4. The words "heretofore erected" in this section, refer to the time of the laying out of the road, and not to the time of the passage of the act.

5. The legislature may incorporate towns and villages within townships for special and limited purposes. In such cases the inhabitants of the district incorporated will remain inhabitants of the township within

* *Rev., p.* 1010, § 79.

which the town or village is situate, for all purposes except those within the object of the municipal government, and the jurisdiction of the township officers over them continues, in so far as is not inconsistent with the provisions of the incorporating act.

6. The charter of the city of Bordentown, and the several supplements thereto, confer upon the inhabitants of the township, within the city limits, mere special police powers, or powers of local government, for certain limited purposes, and do not create the territory within the incorporated limits into a separate and distinct community in all respects. A public road may be laid out by surveyors of the highways as a road "in the township of Bordentown," although the road, as laid, is entirely within the lines of the city; and the assessment of damages to the owners of land taken therefor may be made against "the inhabitants of the township of Bordentown."

On *certiorari* to Burlington Pleas. In the matter of a public road.

Argued June Term, 1870, before DALRIMPLE, DEPUE, and VAN SYCKEL, Justices, by *Hutchinson* and *Browning,* for prosecutrix, and *James Wilson,* for defendants.

The opinion of the court was delivered by

DEPUE, J. On the application of ten freeholders and residents in the county of Burlington, the Court of Common Pleas appointed surveyors of the highways to lay out a public road in the township of Bordentown, in said county. The road applied for lies entirely within the city of Bordentown. The surveyors having made return of the road as laid out, a motion was made to set aside and vacate the proceedings on several grounds, which will be noticed.

The Court of Common Pleas having refused to set aside the proceedings, a writ of *certiorari* was sued out, whereby they were removed to this court.

The first objection made by counsel was, that the Court of Common Pleas had no jurisdiction to lay out a public highway within an incorporated town, city, or borough, which, when laid out, will be a public street of the municipality.

The jurisdiction of the Court of Common Pleas in the

matter of roads is co-extensive with the limits of the county. The second section of the road act, (*Nix. Dig.* 822,*) which grants jurisdiction to the court, empowers the court to make the appointment of surveyors when an application shall be made to them for that purpose by ten or more freeholders who shall think a public road necessary, &c., in any part of the county in which they reside. By the fifty-first section of the act it is declared that the word township as made use of in this act shall be construed to comprehend precinct, ward, city, borough, or town corporate. No authority is given to the city of Bordentown, by its charter, to lay out, alter, or vacate streets or public highways. In the absence of special provision in the charter superseding or excluding the means of procuring new highways within the boundaries of the city, which exists in the general provisions of the road act, the jurisdiction of the Court of Common Pleas remains in force within the city. Its jurisdiction can only be excluded by an implication arising from the fact that the town authorities are clothed with full and complete jurisdiction over the same subject matter. *Cross* v. *Mayor, &c., of Morristown,* 3 *C. E. Green* 308 ; *State* v. *Morristown,* 4 *Vroom* 57.

The second reason relied on for annulling these proceedings is, that the road, as laid, will require the removal or destruction of buildings which are within the prohibition of the thirty-fourth section of the road act. *Nix. Dig.* 829.†

Prior to 1792, the jurisdiction to lay out highways was vested exclusively in the surveyors of the highways. The third section of the road act of 1760 gave directions as to the mode of making applications to surveyors, and provided for the selection of surveyors, and how they should proceed. 2 *Nevill* 346. That section, modified in language, but unchanged in substance, was retained in and became the third section of the act of March 11th, 1774. *Allinson's Laws* 387. The act of 1792 first gave jurisdiction over the subject to the Court of Common Pleas. *Acts* 1792, *p.* 815. The germ of the thirty-fourth section of our present act is

* *Rev., p.* 990, § 1.    † *Rev., p.* 1110, § 79.

the fifth section of the act of 1774. The fourth section of that act recites that many of the public roads in the province had been and were lessened and encroached upon by those owning lands through or on each side of which the same run, to the great inconvenience of the public, to remedy which it was enacted that the overseers should cause the same to be fully opened, and all encroachments removed, with a provision that in case the overseer was in doubt by whom the encroachment was made, he should apply to two justices of the peace and two surveyors to determine the same, whose determination, when made, was final; and the overseer should thereupon proceed to open the same accordingly, and if thereafter any person or persons should stop, lessen, narrow, or encroach upon any road so as aforesaid laid out, or thereafter to be laid out, or commit any nuisance therein, he or they should be liable to a penalty of £3; and if it should be doubtful to the said justices and surveyors which of the adjoining proprietors had encroached, they were required to order the said road to be opened equally on each. Then followed the fifth section, as a proviso to the fourth section, as follows: "Provided, that nothing herein contained shall be construed to extend to altering and widening the streets in any of the cities, towns, or villages in this colony by pulling down or removing any dwelling-house, market-house, or other public building that may heretofore have been erected, and may encroach on any public road." *Allinson* 388. As this section stood in the act of 1774, it manifestly had no reference to the laying out of new roads. Its force and operation were merely restrictive of the power of overseers under the preceding section to remove buildings in cities, towns, and villages which encroached upon the public highway. The fourth and fifth sections of the act of 1774 were retained in the act of March 16th, 1798, and became the fourteenth and fifteenth and sixteenth sections of the latter act. *Pat.* 325. But in that revision a change was made in the language of the fourth and fifth sections of the act of 1774 in some import-

ant particulars. The fourth section was divided into two sections, and that part of it which imposed a penalty for narrowing, encroaching upon, stopping, or obstructing a public road was made into a separate section, (the fifteenth section,) and in general language prescribed a penalty of $10 for narrowing, encroaching upon, &c., any highway. Then followed the fifth section of the act of 1774, as another separate section, (the sixteenth section,) reconstructed as follows: "Provided, always, that nothing in this act contained shall be construed to extend to *narrowing*, widening, or altering any street in any of the cities, towns, or villages in this state, *or* to pulling down or removing any dwelling-house, market-house, or other public building heretofore erected, and which may encroach upon any highway." The effect of this change in language was to enlarge the scope of operation of the section. As it stood in the act of 1774, it was confined to cities, towns, and villages. The introduction of the disjunctive between the two members of the section gave to the latter part of it, which forbade the removal of certain buildings, an operation co-extensive with the operation of the act in which it was contained. But, still, the act of 1798 did not contain any provisions for laying out new roads. Its title was, "An act making provisions for working and repairing the highways," and all its sections were confined to the duties of overseers of the highways in making, amending, and repairing public highways. The mode of laying out highways at that time was under the act of 1792, the provisions of which were embodied in the subsequent act of June 1st, 1799, which is entitled "An act relative to the laying out, vacating, and altering of roads." *Pat.* 387. Although the act of 1799 was repealed by the act of February 22d, 1811, its provisions were substantially re-enacted in the repealing act. *Bloomfield's Laws* 238. Until 1818 the legislation on the subject of the duties of overseers of the highways, and that providing for the mode of laying out, vacating, and altering public roads, were kept entirely separate. The duties of the former continued to be regu-

lated by the act of 1798, whereas the laying out, altering, and vacating of public highways, and the duties of the surveyors of the highways in relation thereto, were regulated by the act of 1799 until its repeal, and after such repeal, by the act of 1811. So long as these two departments of the road system were kept distinct, it was impossible, by any legitimate method of construction, to construe that section of the act of 1798 which restricted the powers of overseers over the streets of cities, villages, and towns, and forbade their removing any of the buildings mentioned, so as to apply its restrictions to the proceedings of surveyors in the matter of laying out new roads. In 1818, by an act entitled "An act concerning roads," passed February 9th, 1818, (*Pamphlet Laws* 26,) all the previous legislation on both these subjects was repealed, and a general act passed, embracing the entire subject of laying out, vacating, and altering public roads, as well as defining the duties of overseers of the highways in making and repairing roads. In this act, the sixteenth section of the act of 1798 was retained precisely as it was, except that the words of proviso were dropped. In this shape that section was retained in the revision of 1820, (*Rev. Laws* 624, § 28,) and also in that of 1846, in which it became the thirty-fourth section of the act. The office of this section in the act of 1818, and in our present road act, is enlarged beyond what it originally was in the act of 1798. Its position in the general statute gives to that part of it which forbids the removal of the designated buildings, the effect of being restrictive of the power of surveyors in laying out roads, as well as of the power of overseers in removing encroachments. This construction was assumed to be correct by Chief Justice Ewing, in *State* v. *Stiles*, 1 *Green* 176; and *In Matter of Highway*, 2 *Zab.* 303, Chief Justice Green declares that the practice under the act has been in conformity with such construction.

The words "heretofore erected" refer to the time of the laying out of the road, and not to the time of the passage

State, Pancoast, pros., v. Troth et al.

of the act.  *Perrine* v. *Farr*, 2 *Zab.* 356, per CHIEF JUS-
TICE GREEN.

Assuming, then, that the section now under consideration
makes the action of surveyors in laying out a road illegal,
when the road is so laid as to make the removal of any of
the buildings named necessary in order to open the road, the
next question is, what must be the description of the build-
ing to bring the case within the inhibition?  The buildings
enumerated in the section are dwelling-house, market-house,
or other public building.  The buildings—parts of which
are within the lines of this road, as laid—are an engine-
house, the stables connected with the hotel of the prosecu-
trix, and also a billiard saloon, attached to the hotel.  The
prosecutrix insists that the engine-house and the billiard
saloon are within the statute—the former as being a public
building, and the latter as being part of the dwelling-house.
The engine house is on the lands of the prosecutrix.  The
building is the property of the fire company which occupies
it.  It is not such a building as was intended by the statute.
The use of the words market-house preceding the words
"*other public building*" shows that the building meant was
such as that the property in it, and also its possession and
use, were in the public.  An engine-house is not a public
building in that sense.  The property in it was not in the
public, and the possession of it was exclusively in the com-
pany which occupied it, and they make no complaint for
its removal.  The mansion-house, in which the keeper of
the hotel resides with his family, is a two-story stone
building, erected many years ago.  The billiard room is a
one-story frame building, which was erected by a tenant
for his own use as a billiard saloon.  It adjoins, but is not
fastened to the main building.  An entrance to it is through
a door leading directly into the bar room, and it is kept as a
billiard room by the keeper of the hotel.  There is no other
occupation of this building.  The meaning of dwelling-
house in this statute is not as comprehensive as when that
term is used in defining the crimes of burglary or arson,

where it includes not only the dwelling, but also out-houses which are within the curtilage, though not under the same roof. That construction is impracticable in this instance. The statute does not prohibit the laying of highways through buildings, except of the enumerated class. With respect to any other building, the ownership of which is in a private individual, a public road may be laid so as to compel its removal without regard to the expense of removal, or the loss that may be occasioned thereby. For such pecuniary injury the person whose property is taken is compensated in damages, to be awarded him by the surveyors. The reason of exempting the dwelling-house is, that the owner and his family may not be deprived of its use for his and their shelter and comfort. The word dwelling-house in this section should be restricted to its literal import—a place of habitation. A building devoted exclusively to business is not within the literal signification of the word, and no reasons of policy require that its strict meaning should be amplified to include a building which—though, for business convenience, connected with a dwelling—is in no manner used for the residence of the owner or his family.

The third reason assigned for the reversal is, that the damages awarded to the prosecutrix for the lands taken were directed to be paid by the township of Bordentown. The argument was, that the road laid out is not within the township of Bordentown, and that, therefore, the damages cannot be assessed against the inhabitants of that township. *Nix. Dig.* 834, §.61.

Bordentown was created a corporation in 1825, under the corporate name of "The Burgesses and Inhabitants of the Borough of Bordentown, in the County of Burlington." *Acts* 1825, *p.* 95. The only officers of the borough were two burgesses, one high constable, and one town clerk, and the franchises of the corporation did not extend beyond the election of these officers, and the voting by the inhabitants of such sums of money "as they might think necessary for the exigencies of the said borough," to be assessed by the bur-

gesses, and collected by such person as they should authorize to collect the same, and the making in town meeting of ordinances and rules for the government of the borough. The powers of the burgesses were for the abatement of nuisances and encroachments on the streets, lanes, alleys, and highways, and the enforcing of such ordinances and rules for the government of the borough as had been adopted in town meeting. In 1831 the number of burgesses was increased to three, and they obtained the additional power to license inns and taverns, and were empowered to exercise the jurisdiction of justices of the peace, under "the act suppressing vice and immorality." *Acts* 1831, *p.* 152. In 1849 the charter was amended in the alteration of the boundaries of the borough, and the inhabitants were authorized to elect a mayor and seven councilmen, and also other officers suitable for a more complete municipal government, with powers and authority enlarged beyond those which were exercised by its previous officers. *Acts* 1849, *p.* 35. By this latter act, parts of the township of Chesterfield, in the county of Burlington, and Nottingham, in the county of Mercer, were included within its corporate limits. Supplements to the charter were passed in 1858, January 29th and February 1st; in 1859, March 1st and 5th; in 1861, March 15th and May 10th; in 1866, April 6th; in 1867, April 3d; and in 1868, March 25th. By the act of 1867 it became the city of Bordentown, and that portion of the township of Nottingham which was included within the boundaries of the borough, as defined in 1849, was omitted from the city limits.

By an act passed in 1852, the township of Bordentown was created out of parts of the townships of Chesterfield and Mansfield, in the county of Burlington. *Acts* 1852, *p.* 3. The boundaries of this new township included within its lines the territory which was embraced within the city limits as defined by the act of 1867, and the incorporating act required the first election for township officers to be held at a place within the borough.

Municipal corporations, including within their bounds minor corporations endowed with powers of local government over its members in some respects, the members of which remain subject to the jurisdiction of the municipal authorities within which they reside, in all respects not inconsistent with the privileges they have as members of the lesser corporation, are not unknown to the law. The cities of Oxford and Cambridge, within which are the two universities, each having special powers of government over its members, are corporations of this kind. Parishes, which are civil divisions of England, for certain purposes of local government, are frequently part within and part without the limits of a borough, and poor rates are levied and collected by overseers of the poor throughout the entire parish, without regard to borough lines. There appears to be no limit to the powers of the crown to grant a charter of municipal incorporation as regards size or the character of the town to be incorporated, except that there cannot be two corporations for the same purposes, with co-extensive powers of government extending over the same district. *Grant on Corp.* 18.

The legislature may create special and limited jurisdictions for the convenience of local government within the territory of the township, without creating such district a separate municipality. Incorporated school districts, under our statute, are instances of corporations with the powers to hold lands, direct the levying of taxes, and adopt regulations for the management of schools, in their corporate capacity, within limits defined for that purpose. Indeed, our system of incorporated towns within counties furnishes a familiar illustration of one corporation with municipal powers within another of larger extent having power of the same nature, though for different objects. Inhabitants residing within such incorporated town are entitled to all the privileges and subject to all the burthens of citizens of the county, unless specially exempted, although in matters of mere local government they are subject to rules and regulations prescribed by the act of incorporation.

State, Pancoast, pros., v. Troth et al.

Acts of the legislature have been passed incorporating towns and villages within townships, for special and limited purposes. In such cases the inhabitants of the district incorporated remain inhabitants of the township within which the town is situate, for all purposes except those within the objects of the municipal government, and the jurisdiction of the township officers continues over them in so far as is not inconsistent with the provisions of the incorporating act. In the nature of things this must be so; otherwise, the inhabitants of this borough, before 1849, would have been without the powers of local government beyond those which would have enabled them to license inns and taverns, abate nuisances, and pass ordinances for the regulation of the domestic affairs of the borough. No state or county taxes could have been assessed or collected, and no elections held for state or county officers, for the reason that the charter made no provision whatever for taxation or elections except for borough purposes. A municipal corporation cannot appoint the public officers necessary to perfect its government for general purposes, under the incidental powers of corporations. Authority for that purpose must be expressly given by its charter. *White* v. *Tallman*, 2 *Dutcher* 67.

It was conceded on the argument, that under the charter of 1825, the borough existed within the townships out of parts of whose territory it was constructed, as a corporation created for the execution of mere police powers within a limited jurisdiction, (*imperium in imperio ;*) and that for all township purposes, the townships of Mansfield and Nottingham remained townships to the extent of their boundaries as if the borough had not existed. It was claimed that the supplements of 1849 and 1861 were the acts of excision, which completely severed the territory within city limits from the township. The difficulty in considering the city as an entirely distinct territory, with respect to the means of government, is diminished but not removed by those acts.

By the supplement of 1849 the powers of the borough government were enlarged, additional officers were author-

ized to be elected or appointed, and the inhabitants were authorized to vote money for local purposes, including the repairs of streets. Still, no provision was made for electing chosen freeholders, members of the town committee, surveyors of the highways, overseers of the roads, or overseers of the poor. These officers were elected for the township at elections at which qualified voters, resident within the borough, voted, and they executed their offices throughout the whole township, including that part within the city limits. The amount to be raised by taxation for making and repairing roads was voted in town meeting, in which the qualified voters within the borough participated, and the money voted was raised by taxation on the taxable inhabitants of the borough and the township. By the supplement of 1861, the common council was empowered to appoint a street commissioner, whose duties in making and repairing the streets and highways of the city were the same as those of the overseers of the roads in the townships of this state; and it was therein expressly declared that the power of the overseers of the roads of the township of Bordentown over the roads in the borough should thenceforth cease, and that thereafter no tax should be assessed on property within the borough for the repair of roads beyond the bounds of the borough, and that no money raised by the inhabitants of the township for the repair of roads should be expended on any of the roads within the borough. In consequence of this separation of the interests of the borough and the township, in the matter of the making and repairing of roads, a supplement was passed enabling the inhabitants of the township proper to vote by themselves in the several road districts such moneys, to be used and expended only in such district. *Acts* 1868, *p.* 23.

Neither the supplement of 1861 nor any subsequent supplement gave the borough or city the power to elect chosen freeholders, members of the township committee, or surveyors of the highway. These are the officers, and the only officers, of a township whose duties pertain to the laying out, altering or vacating of a public road.

State, Pancoast, pros., v. Troth et al.

The course of legislation relating to the city throughout, indicates that the intention of the legislature was to give to the inhabitants of the incorporated limits merely special police powers, or powers of local government for certain limited purposes; and that it was not designed to separate the territory within those limits from the rest of the township, and create it into a separate and distinct community in all respects.

Although the road in question is within the city limits, it is within the township of Bordentown, and the assessment of damages to the prosecutrix was properly made against the inhabitants of the township.

On the argument it was insisted that the fourth section of the supplement of 1861 deprived the town committee, chosen freeholders, and surveyors of the highways of the township of all jurisdiction over the subject of roads within the borough limits. That construction of the act is not tenable. The act, with the exception of the last four sections, relates exclusively to the making and repairing of roads, and does not touch the subject of creating new highways under the general road act. Nor do the restrictions on taxation in that act or any other relating to the city, apply to taxation necessary to pay damages for lands taken for opening new roads. The third section of the supplement of 1850 to the general road act provides the means for raising such moneys. *Nix. Dig.* 834, § 61.* It will be assessed on persons and property within the limits of the township, including that part of it within the city limits, the same as other moneys for township purposes are now assessed.

The proceedings of the surveyors are affirmed.

Judgment reversed. See *State, Rogers, pros.,* v. *Troth,* 7 *Vr.* 422.

---

* *Rev., p.* 909, § 15.